# In the United States Court of Federal Claims

**No. 15-1059C**
**Filed: July 31, 2019**

```
* * * * * * * * * * * * * * * * * * *    *
                                         *
CHRISTOPHER J. WILLIAMS,                  *
                                         *
              Plaintiff,                  *
                                         *
v.                                        *
                                         *
UNITED STATES,                            *
                                         *
              Defendant.                  *
                                         *
* * * * * * * * * * * * * * * * * * *    *
```

**Summary Judgment; Breach of Contract; Settlement Agreement**

**John R. Folkerth**, Folkerth + Routh LLC, Dayton, OH, for plaintiff.[1]

**Alison S. Vicks**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her were **Loren M. Preheim**, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, **Robert E. Kirschman, Jr.**, Director, **Reginald T. Blades**, Assistant Director, and **Joseph H. Hunt**, Assistant Attorney General, Civil Division, United States Department of Justice.

## O P I N I O N

**HORN, J.**

On September 9, 2015, plaintiff Christopher J. Williams filed a complaint in the United States Court of Federal Claims alleging breach of contract against the United States arising from a settlement agreement entered into on June 3, 2014, between the plaintiff and the United States Department of Veteran Affairs (the Settlement Agreement). Plaintiff seeks "damages in an amount not yet fully ascertained, but estimated to be $1,000,000, to include back pay, front pay, pre-judgment interest, interest, cost herein expended, and such other relief as the Court finds just."

## FINDINGS OF FACT

Mr. Williams was employed as a police officer with the Dayton Veterans Affairs Medical Center (DVAMC) from September 23, 2001 until August 9, 2013, when he was removed from his position based on allegations of "Inappropriate Conduct towards Staff,"

---

[1] Plaintiff filed his complaint pro se. Subsequently, plaintiff retained Mr. Folkerth as counsel of record.

and "Conduct Unbecoming a Federal Employee."[2] (capitalization in original). According to plaintiff's complaint, Mr. Williams had "maintained an exemplary performance record consistently receiving 'Exceptional' performance ratings, and no disciplinary action," up until the time of his removal. According to the parties' statement of undisputed material facts, Mr. Williams appealed his removal to the Merit System Protection Board (MSPB). On June 3, 2014, plaintiff and the DVAMC entered into the Settlement Agreement.

The Settlement Agreement provided that Mr. Williams' "August 9, 2013, removal for 'Inappropriate Conduct Toward Staff' and 'Conduct Unbecoming a Federal Employee' shall be rescinded." The Settlement Agreement, signed by Mr. Williams and by Mr. Glen A. Costie, as "Medical Center Director," on behalf of the DVAMC on June 3, 2014, provided that "[t]he Agency shall process a Standard Form 50[3] and a Standard Form 52; (1) rescinding Appellant's [Mr. Williams'] removal and (2) restoring him to the position of Police Officer, Police Service, Dayton Veterans Affairs Medical Center retroactive to August 9, 2013." In addition, the Settlement Agreement stated that "[t]he Parties agree that any, and all, documents of, and concerning, the Appellant's Notice of Proposed Removal and Removal Decision shall be removed from all files electronic, or otherwise, under the control of Dayton Veterans Affairs Medical Center." In the words of the Settlement Agreement, Mr. Williams was to be reinstated as a DVAMC employee on leave without pay status until June 30, 2016. According to the plaintiff's motion for partial summary judgment, plaintiff's "entire motivation for entering into the Settlement Agreement was so that he could pursue his career as a VA Police Officer." According to the Settlement Agreement, the "purpose of the LWOP [leave without pay] period . . . of this agreement is to afford him the opportunity to apply for other federal positions as a federal employee" for approximately twenty-six months. Under the Settlement Agreement, during the approximately twenty-six months period, Mr. Williams was "free, under the Department of Veterans Affairs policies and procedures, to apply for vacant positions at other Department of Veterans Affairs facilities, save for; the Dayton Veterans Affairs Medical and/or any of its affiliated Community Based Out-Patient Clinics under Dayton Veterans Affairs Medical Center's control." Further, according to the Settlement Agreement, "should Appellant fail to obtain a position by **June 30, 2016**, his LWOP status shall be terminated, and he will be considered to have resigned."[4] (emphasis in original).

---

[2] Although plaintiff's motion for partial summary judgment, Mr. Williams' affidavit and the Settlement Agreement all list the charges as "Inappropriate Conduct towards Staff," and "Conduct Unbecoming a Federal Employee," plaintiff's Standard Form 50 indicates "REASON FOR SUSPENSION : INAPPROPRIATE CONDUCT AND CONDUCT UNBECOMING A FEDERAL EMPLOYOEE [sic]." (capitalization in original).

[3] The parties refer to Standard Form 50 as "SF-50" in their submissions. The court similarly refers to Standard Form 50 as SF-50 in this Opinion.

[4] Conversely, the Settlement Agreement indicated that Mr. Williams understood that "should he obtain another position with another Federal Agency prior to **June 30, 2016,** that his LWOP status shall be terminated." (emphasis in original). It is unclear from the record whether or when Mr. Williams obtained employment.

The Settlement Agreement also provided that Mr. Williams would receive a neutral reference from the DVAMC and would be paid a lump sum of "$45,000.00 to satisfy any, and all, claims of attorney fees, back pay, benefits, compensatory damages, or lost wages."[5] For purposes of the Settlement Agreement, a "'neutral reference' shall mean that the Agency shall provide the following information to a prospective employer; (1) position held, (2) dates position held, and (3) salary of position held." According to the Settlement Agreement, "[t]he Agency agrees that it will neither impede, nor interfere with the Appellant's efforts to transfer to other federal agencies including, but not limited to, the Department of Veterans Affairs," and "[t]he Agency agrees that it will neither impede, nor interfere with the Appellant's efforts to obtain employment with any employer, federal sector or otherwise." The Settlement Agreement also provided that "[t]he Parties agree that this settlement agreement, consisting of four (4) pages constitutes, constitutes [sic] the full agreement between the Parties and that there are no other agreements oral and/or written with respect to the Appellant's appeal [at the MSPB]."

On June 5, 2014, two days after the Settlement Agreement was executed, Mr. Williams applied for a police officer position at the West Palm Beach Veterans Affairs Medical Center in West Palm Beach, Florida. As indicated in the parties' statement of undisputed facts, Mr. Williams did not include the SF-50 form as required by the application. Based on the absence of the SF-50 form, the West Palm Beach Veterans Affairs Medical Center considered the application to be incomplete and Mr. Williams was deemed not eligible for the position, resulting in the denial of his application.

In July of 2014, Mr. Williams applied for a police officer position at the Lake Nona Veterans Affairs Medical Center in Orlando, Florida. Mr. Williams submitted an SF-50 with his position removal still noted on the SF-50 with his application to the Lake Nona Veterans Affairs Medical Center. According to the parties' statement of undisputed material facts, the SF-50 that Mr. Williams submitted with his application was not shown to the interviewing panel, or seen by the selecting officer, but was used by human resources personnel to determine if Mr. Williams was eligible for the position. According to the declaration of Michael Brown, a human resources specialist at the Lake Nona Veterans Affairs Medical Center, Mr. Williams "applied for several police officer positions" and "[a] review of the records shows that Mr. Williams's resume was referred (amongst several others) to the interviewing panel for one of those positions." Mr. Williams was interviewed, but was not ultimately selected, for a police officer position with the Lake Nona Veterans Affairs Medical Center. During the interview, Mr. Williams was told by the Deputy Chief of Police for the Lake Nona Veterans Affairs Medical Center "that he [the Deputy Chief] was unable to locate Mr. Williams through an Agency-wide Microsoft Outlook search or locate his [Mr. Williams'] address." (capitalization in original).

---

[5] The Settlement Agreement provided that "payment shall be made via two checks, one to 'Christopher Williams' in the amount of $19,545.97, and one to Weprin and Folkerth, LLC, in the amount of $25,454.03." In June 2014, payment in the total amount of $45,000.00 was made, as required by the Settlement Agreement.

3

Mr. Williams alleges in his complaint that:

Mr. Williams learned that his personnel file was in an "inactive" status. On September 30, 2014, a Human Resources representative from the Orlando Veterans Affairs Medical Center told Mr. Williams they were questioning whether he was in fact a current employee and asked Mr. Williams the name of his supervisor. Mr. Williams responded that he was on LWOP and provided the name of the Captain at Dayton. A current email address indicates a "current" employee status required for application.

On October 1, 2014, Mr. Williams spoke with the human resources department at the DVAMC and Mr. Williams was provided with the three most recent SF-50s in his personnel file. Mr. Williams alleges that he did not receive an offer for the police officer position at the Lake Nona Veterans Affairs Medical Center because of the SF-50 that the DVAMC sent the Lake Nona Veterans Affairs Medical Center. According to plaintiff, the SF-50 that was sent to the Orlando center reflects the "Nature of Action" as a "REMOVAL," and under "Remarks," the "REASON FOR SUSPENSION : INAPPROPRIATE CONDUCT AND CONDUCT UNBECOMING A FEDERAL EMPLOYOEE [sic]." (capitalization in original). Furthermore, the SF-50 provided to Mr. Williams referenced the Settlement Agreement, and included a case number before the MSPB. Under remarks, the SF-50 stated: "MSPB SETTLEMENT AGREEMENT DOCKET NO. CH-0752-13-2514-I-1, DTD 6/3/2014." (capitalization in original).[6]

On October 2, 2014, Mr. Williams, through his attorney Kenneth Heisele, notified the DVAMC that Mr. Williams' SF-50 had not been corrected. On November 6, 2014, Mr. Williams called the electronic officer personnel file help desk to ensure that the information regarding his removal had been removed from his personnel file. During this conversation with the help desk, Mr. Williams alleges that he "learned that the records showed that he was no longer a federal employee and his personnel file was being transferred to the National Archives for former employees, even though the DVAMC [sic] had been reinstated by the Settlement Agreement as a current employee." The defendant asserts that a miscommunication delayed the request for Mr. Williams' files to be corrected, but that Mr. Williams' SF-50 was eventually corrected, according to the record before the court in November 2014.

---

[6] The court notes that Mr. Williams had multiple SF-50s in his file, including one which listed the "Nature of Action" as a "REMOVAL," and under "Remarks," the "REASON FOR SUSPENSION : INAPPROPRIATE CONDUCT AND CONDUCT UNBECOMING A FEDERAL EMPLOYOEE [sic]," as well as one which referenced the Settlement Agreement, and included a case number before the MSPB. Under remarks, the SF-50 stated: "MSPB SETTLEMENT AGREEMENT DOCKET NO. CH-0752-13-2514-I-1, DTD 6/3/2014." (capitalization in original). The Settlement Agreement as well as the parties briefs typically refer to the SF-50s generically as the SF-50. Unless "SF-50s" is in a quotation, the court likewise refers to the multiple SF-50 documents in Mr. Williams' file as the SF-50 in this Opinion.

Mr. Williams also applied for the position of police officer at Bay Pines Veterans Affairs Medical Center, in Bay Pines, Florida. On November 11, 2014, he interviewed with a Captain and a police officer from Bay Pines Veterans Affairs Medical Center. As with the application to the Lake Nona Veterans Affairs Medical Center, Mr. Williams' SF-50 referenced the MSPB case number and the Settlement Agreement, and included the removal language as well as the notation that "REASON FOR SUSPENSION : INAPPROPRIATE CONDUCT AND CONDUCT UNBECOMING A FEDERAL EMPLOYOEE [sic]." (capitalization in original). Mr. Williams had a telephonic interview with the Chief at Bay Pines Veterans Affairs Medical on November 17, 2014. Mr. Williams' complaint alleges that "[i]n that lengthy conversation, the captain gave Mr. Williams several indications that he was very likely to get the job. For example, he was 'selling' their location to Mr. Williams and discussing how wonderful their beaches are, why he should want to live on the Gulf side, and how their location is better than Orlando's."

On November 14, 2014, more than five months after the Settlement Agreement was executed, Mr. Heisele contacted the DVAMC by email on behalf of Mr. Williams to remind the DVAMC "that compliance with the Settlement Agreement was imperative so as not to cost Mr. Williams another job opportunity." Mr. Heisele's email indicates:

> We're expecting that Mr. Williams will be able to get this position. We want to make sure that the Agency has fully complied with all the provisions of the settlement agreement and that its actions do not jeopardize Mr. Williams' ability to get this job. He's [Mr. Williams] understandably concerned that this may fall apart when Dayton HR becomes involved, in light of all the outstanding problems we have noticed since the case settled several months ago. Please make sure all the issues we discussed are corrected. If Mr. Williams gets this job, we can all hopefully put these matters behind us.

Demetrious Harris, an attorney for the DVAMC, was the recipient of Mr. Heisele's email, and he forwarded the email to Rolanda Watkins, the Chief of the DVAMC's human resources services. Ms. Watkins responded to Demetrious Harris' email on November 17, 2014, and stated:

> A group of us met today to discuss the next steps required to wrap up this agreement. Mr. Williams' eOPF [electronic officer personnel file] was actually sent to the national archives when he was dropped from the system. Charlie [Heisele] will provide you with an update of when we can expect to get it back. In the meantime, we will fix the comments on the SF-50s manually and take out any references to the removal and MSPB settlement agreement.
>
> Charlie will provide you with the update on re-establishing an email account for him.

Do you know if he received his neutral letter of reference? I just wanted to make sure we met all terms of the settlement agreement.

On November 17, 2014, after Mr. Williams' telephonic interview at the Bay Pines Veterans Affairs Medical Center, Captain Kyer, at the DVAMC, was called for a reference check by the Chief of Police at Bay Pines. As indicated above, a neutral reference was required to be provided under the terms of the Settlement Agreement. Captain Kyer's declaration, submitted with defendant's motion for summary judgment, indicated: "I was Christopher Williams's direct supervisor in the police service at the Dayton VAMC. I was aware of his settlement agreement in 2014 that placed Christopher. Williams on leave without pay and allowed him to apply to other Federal positions. I was aware of the requirement in the agreement to provide a neutral reference should anyone call for a reference check on Mr. Williams."  Captain Kyer's declaration also indicated: "I told the chief that I was Mr. Williams's supervisor. I told the chief that I would stand by the "outstanding" reviews I have given Mr. Williams in his performance evaluations at Dayton."

Plaintiff asserts in his motion for partial summary judgment that Captain Kyer's reference was a clear indication

that someone had made negative comments to the Police Chief about Mr. Williams' performance. Furthermore, no explanation is given as to why Capt. Kyer would know that he was required to provide Mr. Williams with a neutral reference, but no one in the DVAMC HR department knew what the DVAMC was required to do with respect to issuing the appropriate SF-50 and SF-52 forms reinstating Mr. Williams and placing him on a LWOP status, and expunging information about Mr. Williams' removal from his eOPF

According to the declaration of Ms. Watkins, included as an exhibit to defendant's motion for summary judgment, in November 2014, the DVAMC "[h]uman resources received Mr. Williams's eOPF back in November 2014. At that time, the SF-50 referencing Mr. Williams's removal and settlement agreement were removed, and Mr. Williams's new SF-50 was placed in the file."[7] Ms. Waktins' declaration also indicated

---

[7] The parties do not provide a precise date that the SF-50 referencing Mr. Williams' removal and the Settlement Agreement was removed from plaintiff's file, and the new SF-50 was placed in plaintiff's file. The court notes, however, as indicated above, Ms. Watkins' email to Demetrious Harris was sent on November 17, 2014, and reflected that the SF-50 had not yet been replaced. Ms. Watkins wrote, in part, "[a] group of us met today to discuss the next steps required to wrap up this agreement," and "[i]n the meantime, we will fix the comments on the SF-50s manually and take out any references to the removal and MSPB settlement agreement." Therefore, the earliest the SF-50 referencing Mr. Williams' removal and the Settlement Agreement were removed, and the new SF-50 was placed in plaintiff's file would have been after November 17, 2014.

that "[a]ccess to the eOPFs of Dayton employees is limited to the Dayton human resources department. Human resource departments at other VAMCs cannot access Dayton employee files." Therefore, according to the defendant, another federal facility can see Dayton Department of Veteran Affairs Medical Center's files only if the file is transferred.  As refenced in the parties' undisputed material facts:

> In order to transfer an employee's eOPF to another Federal facility, including another VAMC [Veteran Affairs Medical Center], the human resources department at Dayton must receive an official notice of transfer of the employee. Transfer notification is done by SF-50, and the human resources department at the Dayton VAMC will transfer the complete eOPF to another agency only upon receipt of the SF-50 indicating that the employee has transferred.

(internal citation omitted). According to the parties' statement of undisputed material facts, the human resources department at DVAMC never transferred Mr. Williams' file to any other agency.

According to the plaintiff, on December 4, 2014, Mr. Williams learned that he was not selected for the Bay Pines Veterans Affairs Medical Center position. Mr. Williams also learned that he was not selected for a position with the Lake Nona Veterans Affairs Medical Center. Mr. Williams contends that, because his SF-50 was not corrected, he was not selected for the various positions he had applied for, and, therefore, the DVAMC was in breach of the Settlement Agreement. The defendant, however, contends that the plaintiff was not denied those positions based on Mr. Williams' SF-50 because Mr. Williams was interviewed, although ultimately not selected for, the jobs.

Based on Mr. Williams' belief that the DVAMC breached the Settlement Agreement, Mr. Williams submitted an online inquiry to the DVAMC's customer service. On January 2, 2015, Glenn Costie, the Medical Center Director at the DVAMC, and the agency signatory to the Settlement Agreement, responded to Mr. Williams' inquiry with the following email:

> Let me begin by apologizing for the series of mishaps that have occurred, relating to the Dayton Department of Veteran [sic] Affairs Medical Center's (DVAMC) failure to ensure the settlement agreement was upheld to the fullest extent possible. These incidents have allegedly placed you at a disadvantage for gaining suitable employment at the Orlando DVAMC. However, there was no malice intended and each oversight was promptly corrected.

> Per the settlement agreement your August 9, 2013, removal was rescinded and you were placed in a leave without pay (LWOP) status; with a not to

Because the court does not have an exact date, however, the court refers to the date the changes appear to have been made as "November 2014."

7

exceed date of June 30, 2016, at the Dayton DVAMC. Unfortunately, a representative from Human Resources Management Service (HRMS) indicated MSPB Settlement Agreement and the docket number in the remarks section. This individual was merely recording information that is routinely placed under Section F of the SF-50. The fact that this reference revealed more than an individual being placed in a LWOP status was truly an unintentional oversight. However, that information was removed immediately from the SF-50 located in your electronic Official Personnel Folder (eOPF) after it was brought to our attention. Secondly, Jennifer Short, HR Assistant, Processing and Records, HRMS was mistaken in her advisement that any VA could have looked into your eOPF and seen this document. You are still assigned to the Dayton DVAMC and only those with access to the Enterprise HR Integration eOPF site here at the Dayton DVAMC can view your eOPF. Since that is now corrected you have no worries if you are subsequently assigned to the Orlando DVAMC or any other VA [offices]. Lastly, there was the issue with the email address. This was not addressed in the settlement agreement, so this is not per se a breach. There are a number of amenities afforded to VA employees, to include Outlook and VISTA accounts. However, since this fact was identified by Deputy Chief Phillips as indication of you being an employee; we have graciously activated an Outlook account with your name.

(capitalization in original). Mr. Costie's response is consistent with the affidavit of Rolonda Watkins, submitted with defendant's motion for summary judgment, which states:

Due to miscommunications between employees of the human resources department, Mr. Williams's files was [sic] not immediately requested back from the Archives. Human resources received Mr. Williams's eOPF back in November 2014. At that time, the SF-50s referencing Mr. Williams's removal and settlement agreement were removed, and Mr. Williams's new SF-50 was placed in the file. The replacement of Mr. Williams's SF-50 was the result of miscommunications between employees of the human resources department and the fact that Mr. Williams's file was sent to the National Archives after he was removed from employment in 2013. The delay was not due to any intention not to fulfill the terms of the settlement agreement.

In addition to the email, on August 11, 2015, Mr. Williams received a letter from Mr. Costie stating that:

An audit was conducted on your electronic official personnel file (EOPF), [sic] which revealed that you were reinstated into our system. Thus, there is a Standard Form (SF) 50, Notification of Personnel Action effective August 9, 2013, that reflects you being on Leave Without Pay, not-to-exceed June 30, 2016. Additionally, there is no indication of a removal mentioned in your EOPF.

8

(capitalization in original). Mr. Costie's communications and Ms. Watkins' affidavit all reflect that the Settlement Agreement was not expeditiously or promptly implemented by the agency.

On September 9, 2015, plaintiff filed his complaint in the United States Court of Federal Claims In response to plaintiff's complaint, defendant filed an answer. After the court denied plaintiff's motion to compel, the parties conducted two rounds of discovery, and after the second round of discovery was completed, the defendant filed a motion for summary judgment. After plaintiff retained Mr. Folkerth as his counsel of record, plaintiff filed a motion for partial summary judgment on the issue of liability.

In plaintiff's motion for partial summary judgment as to liability, plaintiff asserts that the defendant does not offer "any facts that would permit the Defendant to avoid liability with respect to the DVAMC's breach of the Settlement Agreement." Plaintiff also alleges that the defendant's breach caused plaintiff "to incur substantial damages." In addition, plaintiff alleges that because the defendant does not "contest the fact that these terms of the Settlement Agreement are the essence of the Settlement Agreement, and the DVAMC's failure to timely implement these commitments in breach of the Settlement Agreement demonstrates bad faith." In the defendant's reply brief, however, defendant argues that based on the undisputed facts, Mr. Williams has provided no evidence that the DVAMC did not comply with the Settlement Agreement.

## DISCUSSION

Plaintiff's motion for partial summary judgment as to liability and defendant's motion for summary judgment address whether or not defendant breached the Settlement Agreement between plaintiff and the DVAMC. Rule 56 of the United States Court of Federal Claims Rules (RCFC) is similar to Rule 56 of the Federal Rules of Civil Procedure in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a) (2019); Fed. R. Civ. P. 56(a) (2019); see also Alabama v. North Carolina, 560 U.S. 330, 344 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Biery v. United States, 753 F.3d 1279, 1286 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Ladd v. United States, 713 F.3d 648, 651 (Fed. Cir. 2013); Minkin v. Gibbons, P.C., 680 F.3d 1341, 1349 (Fed. Cir. 2012); Noah Sys., Inc. v. Intuit Inc., 675 F.3d 1302, 1309-10 (Fed. Cir. 2012); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d 1365, 1372 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2012); Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1325 (Fed. Cir.), reh'g denied (Fed. Cir. 2010); Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); 1st Home Liquidating Trust v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009);

Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370-71 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Mata v. United States, 114 Fed. Cl. 736, 744 (2014); Leggitte v. United States, 104 Fed. Cl. 315, 317 (2012); Arranaga v. United States, 103 Fed. Cl. 465, 467-68 (2012); Cohen v. United States, 100 Fed. Cl. 461, 469 (2011); Boensel v. United States, 99 Fed. Cl. 607, 610 (2011).

A fact is material if it will make a difference in the result of a case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248); Mata v. United States, 114 Fed. Cl. at 744; Arranaga v. United States, 103 Fed. Cl. at 467-68; Thompson v. United States, 101 Fed. Cl. 416, 426 (2011); Cohen v. United States, 100 Fed. Cl. at 469. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Gorski v. United States, 104 Fed. Cl. 605, 609 (2012); Walker v. United States, 79 Fed. Cl. 685, 692 (2008); Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Schlup v. Delo, 513 U.S. 298, 332 (1995); TigerSwan, Inc. v. United States, 118 Fed. Cl. 447, 451 (2014); Dana R. Hodges Trust v. United States, 111 Fed. Cl. 452, 455 (2013); Cohen v. United States, 100 Fed. Cl. at 469-70; Boensel v. United States, 99 Fed. Cl. at 611; Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 717 (2011); Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States, 87 Fed. Cl. 113, 126 (2009); Johnson v. United States, 49 Fed. Cl. 648, 651 (2001), aff'd, 52 F. App'x 507 (Fed. Cir. 2002), published at 317 F.3d 1331 (Fed. Cir. 2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health and Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993); Leggitte v. United States, 104 Fed. Cl. at 316. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d at 1372; Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968; Am. Seating Co. v. USSC Grp., Inc., 514 F.3d 1262, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008); Rothe Dev. Corp. v. U.S. Dep't of Def., 262 F.3d 1306, 1316 (Fed. Cir. 2001); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such cases, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

In appropriate cases, summary judgment:

saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

Dehne v. United States, 23 Cl. Ct. 606, 614-15 (1991) (quoting Pure Gold, Inc. v. Syntex, (U.S.A.) Inc., 739 F.2d 624, 626 (Fed. Cir. 1984)) (citation omitted), vacated on other grounds, 970 F.2d 890 (Fed. Cir. 1992); see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 806 (Fed. Cir. 1999) ("The purpose of summary judgment is not to deprive a litigant of a trial, but to avoid an unnecessary trial when only one outcome can ensue."); Metric Constr. Co., Inc. v. United States, 73 Fed. Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999); TigerSwan, Inc. v. United States, 118 Fed. Cl. at 451; Stephan v. United States, 117 Fed. Cl. 68, 70 (2014); Gonzales-McCaulley Inv. Grp., Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Yant v. United States, 588 F.3d 1369, 1371 (Fed. Cir. 2009), cert. denied, 562 U.S. 827 (2010); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)); Dana R. Hodges Trust v. United States, 111 Fed. Cl. at 455; Boensel v. United States, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; and Lathan Co. Inc. v. United States, 20 Cl. Ct. 122, 125 (1990))); see also Am. Seating Co. v. USSC Grp., Inc., 514 F.3d at 1266-67; Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807. "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material

fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank, F.S.B. v. United States, 584 F.3d 1369, 1374 (Fed. Cir. 2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Riley & Ephriam Constr. Co. v. United States, 408 F.3d 1369, 1371 (Fed. Cir. 2005); Crown Operations Int'l Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir.), reh'g denied (Fed. Cir. 2002); Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 741 (Fed. Cir.) (quoting Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994), reh'g denied and en banc suggestion declined (Fed. Cir. 1995)), reh'g denied and en banc suggestion declined (Fed. Cir. 1997); Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1569 (Fed. Cir. 1997); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; RQ Squared, LLC v. United States, 119 Fed. Cl. 751, 757-58 (2015), subsequent determination, 129 Fed. Cl. 742 (2017), aff'd, 708 F. App'x 685 (Fed. Cir. 2018). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. at 322; see also Wavetronix LLC v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir. 2009); Long Island Sav. Bank, FSB v. United States, 503 F.3d at 1244; Fla. Power & Light Co. v. United States, 375 F.3d 1119, 1124 (Fed. Cir. 2004); Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1207 (Fed. Cir. 2001); Am. Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; Rasmuson v. United States, 109 Fed. Cl. 267, 271 (2013). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. See Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968-69; Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), reh'g denied and en banc suggestion declined (Fed. Cir. 1999); Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997); B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); LewRon Television, Inc. v. D.H. Overmyer Leasing

Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); Rogers v. United States, 90 Fed. Cl. 418, 427 (2010), subsequent determination, 93 Fed. Cl. 607 (2010), aff'd, 814 F.3d 1299 (2015); Consol. Coal Co. v. United States, 86 Fed. Cl. 384, 387 (2009), aff'd, 615 F.3d 1378 (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the non-moving party. See First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); see also DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1322 (Fed. Cir. 2001); Gart v. Logitech, Inc., 254 F.3d 1334, 1338-39 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1114 (2002); Oswalt v. United States, 85 Fed. Cl. 153, 158 (2008); Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006).

This court has jurisdiction to review Settlement Agreements, which are in the nature of a contract between a private citizen or business entity and the government because a Settlement Agreement is a contract. See Ramona Two Shields v. United States, 820 F.3d 1324, 1329 (Fed. Cir. 2016) ("We treat the Cobell settlement as a contract . . . the proper interpretation of which is a question of law . . . ."); Cunningham v. United States, 748 F.3d 1172, 1176 (Fed. Cir. 2014) ("We have long held that disputes over Settlement Agreements are governed by contract principles."); Slattery v. Dep't of Justice, 590 F.3d 1345, 1349 (Fed. Cir. 2010) ("Settlement Agreement disputes are governed by contract principles."); Lutz v. United States Postal Serv., 485 F.3d 1377, 1381 (Fed. Cir. 2007); Musick v. Dep't of Energy, 339 F.3d 1365, 1369 (Fed. Cir. 2003) ("A Settlement Agreement is a contract, the interpretation of which is a question of law."); Kasarsky v. Merit Sys. Prot. Bd., 296 F.3d 1331, 1336 (Fed. Cir. 2002) ("Disputes involving Settlement Agreements are governed by contract principles."); Conant v. Office of Personnel Mgmt., 255 F.3d 1371, 1376 (Fed. Cir. 2001) ("A settlement agreement is a contract . . . ."); Greco v. Dep't of the Army, 852 F.2d 558, 560 (Fed. Cir. 1988) ("It is axiomatic that a Settlement Agreement is a contract."); Rebish v. United States, 134 Fed. Cl. 308, 315 (2017); Eby v. United States, 133 Fed. Cl. 706, 709 (2017). Therefore, an alleged breach of a Settlement Agreement involving damages of more than $10,000.00 is within the Tucker Act jurisdiction of the United States Court of Federal Claims. See Nutt v. United States, 121 Fed. Cl. 579, 584 (2015) (quoting VanDesande v. United States, 673 F.3d 1342, 1346 (Fed. Cir. 2012)), aff'd, 837 F.3d 1292 (Fed. Cir. 2016); see also Caraballo v. United States, 124 Fed. Cl. 741, 748 (2016), aff'd, 691 F. App'x 613 (Fed. Cir. 2017).

It is well settled that "[t]o recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."[8] San

---

[8] As indicated by a Judge of the United States Court of Federal Claims, "[t]o satisfy this fourth element, the plaintiff also must show that: '(1) the damages were reasonably

Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir.), reh'g denied (Fed. Cir. 1989); see also Me. Cmty. Health Options v. United States, 142 Fed. Cl. 53, 77 (2019); Allen v. United States, 140 Fed. Cl. 550, 560 (2018);  Shell Oil v. United States, 130 Fed. Cl. 8, 34 (2017); Barlow & Haun, Inc. v. United States, 118 Fed. Cl. 597, 620 (2014); Cooley v. United States, 76 Fed. Cl. 549, 555–56 (2007) (citing San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959).

In order to prevail in a claim for breach of a settlement agreement, a plaintiff must demonstrate "material non-compliance by the agency with the terms of the settlement agreement." Lutz v. U.S Postal Serv., 485 F.3d at 1381; see also Gilbert v. Dep't of Justice, 334 F.3d 1065, 1071 (Fed. Cir. 2003) ("A party breaches a contract when it is in material non-compliance with the terms of the contract."). The United States Court of Appeals for the Federal Circuit has indicated that a breach is material when it relates to "a matter of vital importance and goes to the essence of the contract." Thomas v. Dep't of Hous. & Urban Dev., 124 F.3d 1439, 1442 (Fed. Cir. 1997) (citing 5 Arthur L. Corbin, Corbin on Contracts § 1104 (1964)); see also Lutz v. U.S Postal Serv., 485 F.3d at 1381; Chevron U.S.A. v. United States, 110 Fed. Cl. 747, 800 (2013); D'Andrea Bros. LLC v. United States, 109 Fed. Cl. 243 (2013) (quoting Thomas v. Dep't of Hous. & Urban Dev., 124 F.3d at 1442 (citing 5 Arthur L. Corbin, Corbin on Contracts § 1104)); 5860 Chicago Ridge, LLC v. United States, 104 Fed. Cl. 740, 755 (2012).

As indicated by the parties' statement of undisputed material facts, the parties entered into a Settlement Agreement on June 3, 2014 and the Settlement Agreement signed by the parties was a valid contract. The plaintiff contends, that under the Settlement Agreement, the defendant breached the Settlement Agreement by not timely replacing the plaintiff's SF-50, failing to provide the plaintiff a neutral reference, and thereby interfering with plaintiff's opportunity to obtain other employment. Plaintiff's partial motion for summary judgment claims that "the DVAMC has admitted to the breach of the Settlement Agreement per Mr. Costie's email," and that "this breach of the Settlement Agreement is undisputed." By contrast, although not apparently disputing that there was a failure to expeditiously and properly replace plaintiff's SF-50 to remove the negative information in plaintiff's file, defendant argues, however, that the DVAMC did not materially breach the Settlement Agreement "because the SF-50 referencing his removal remained in his eOPF for a period of time after the settlement agreement was signed," but that "[t]he delay in replacing Mr. Williams's SF-50s was remedied." Defendant also argues that the DVAMC "provided an excellent reference" and "that none of the DVAMC's actions identified by Mr. Williams resulted in his non-selection for a job."

As noted above, the parties both signed the Settlement Agreement on June 3, 2014. The agency did not remove the SF-50 reference to Mr. Williams' removal, a specific and key provision of the Settlement Agreement, until November 2014, approximately five

_____

foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty.'" Shell Oil v. United States, 130 Fed. Cl. at 34 (quoting Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005)).

months after the Settlement Agreement was signed. Moreover, Mr. Costie, the agency signatory to the Settlement Agreement, in an email to plaintiff apologized for the "series of mishaps" which "relat[ed] to the Dayton Department of Veteran Affairs Medical Center's (DVAMC) failure to ensure the settlement agreement was upheld to the fullest extent possible," and admitted that "[t]hese incidents have allegedly placed you at a disadvantage for gaining suitable employment at the Orlando DVAMC."

Based on the record before the court, the court concludes that the defendant's failure to take affirmative action to revise plaintiff's SF-50 in order to allow him to pursue alternative employment during the five month delay was a breach of both the terms and spirit of the Settlement Agreement. The court, however, also considers if the defendant's failure to act and the five month delay processing a revised SF-50 was "material non-compliance with the terms of the contract." Lutz v. U.S Postal Serv., 485 F.3d at 1381.

The Settlement Agreement provided that "[t]he Agency shall process a Standard Form 50 and a Standard Form 52; (1) rescinding Appellant's [Mr. Williams'] removal and (2) restoring him to the position of Police Officer, Police Service, Dayton Veterans Affairs Medical Center retroactive to August 9, 2013," and placing Mr. Williams on leave without pay status for approximately twenty-six months. The Settlement Agreement further provided that "[t]he Parties agree that any, and all, documents of, and concerning, the Appellant's Notice of Proposed Removal and Removal Decision shall be removed from all files electronic, or otherwise, under the control of Dayton Veterans Affairs Medical Center." The Settlement Agreement also provided that Mr. Williams would receive a neutral reference, which under the terms of the Settlement Agreement "shall mean that the Agency shall provide the following information to a prospective employer; (1) position held, (2) dates position held, and (3) salary of position held." The Settlement Agreement separately provided that "[t]he Agency agrees that it will neither impede, nor interfere with the Appellant's efforts to transfer to other federal agencies including, but not limited to, the Department of Veterans Affairs," and also that "[t]he Agency agrees that it will neither impede, nor interfere with the Appellant's efforts to obtain employment with any employer, federal sector or otherwise."

After the Settlement Agreement was entered into, the Agency must have understood that plaintiff intended to promptly apply for other jobs, and that a corrected SF-50 was important to plaintiff because the Settlement Agreement specifically addressed correcting the SF-50, and only provided a limited amount of time for plaintiff to have leave without pay status. Moreover, the agency also should have understood that any indication in plaintiff's file that he was not an active employee would likely jeopardize plaintiff's ability to be considered for a job or receive a positive response to any job applications in the agency. Finally, the agency should have understood that references in plaintiff's SF-50 regarding the Settlement Agreement and the MSPB case would have a negative impact on plaintiff's ability to secure employment. Defendant confirms that:

> The SF-50 that the applicant submits is used to confirm the Federal status
> of the applicant. Federal status is necessary for the applicant to be eligible
> to apply for police officer positions, which are restricted to status eligible

candidates. If the SF-50 indicates that the applicant has a current Federal status, that candidate's resume is forwarded to an interviewing panel for further consideration.[9]

(internal citations omitted). Therefore, because the personnel departments at Veterans Affairs offices appear to determine an applicant's status based on the SF-50 form submitted or not submitted with a job application, the revised SF-50 was critical and material to plaintiff's ability to succeed with respect to any applications he submitted for future VAMC police officer jobs or likely for other government jobs. Mr. Williams was obligated to submit an SF-50 with an application, certainly for a VAMC job, so that the applicable human resources department could determine if Mr. Williams was or was not eligible to apply for open positions.[10]

Specifically regarding the SF-50, plaintiff argues that defendant breached to the Settlement Agreement by failing to replace plaintiff's SF-50 when he was applying for other jobs at the agency, which prevented Mr. Williams from obtaining such other employment. Defendant, however, argues that the DVAMC replaced Mr. Williams' SF-50 in accordance to the Settlement Agreement and that the delay in replacing Mr. Williams' SF-50 did not affect Mr. Williams' job prospects because Mr. Williams was able to apply for open positions in the West Palm Beach Veterans Affairs Medical Center, Lake Nona Veterans Affairs Medical Center, and the Bay Pines Veterans Affairs Medical Center, and was interviewed for the Lake Nona VAMC and Bay Pines VAMC jobs.

Regarding Mr. Williams' June 5, 2014 application to the West Palm Beach Veterans Affairs Medical Center, Mr. Williams argues that because the DVAMC failed to issue Mr. Williams revised SF-50, Mr. Williams' application for the West Palm Beach job was denied. The parties' statement of undisputed material facts reflect that when he applied for the West Palm Beach job, Mr. Williams did not include an SF-50 form as

---

[9] 5 C.F.R. § 212.301 indicates that

> competitive status means an individual's basic eligibility for noncompetitive assignment to a competitive position. Competitive status is acquired by completion of a probationary period under a career-conditional or career appointment, or under a career executive assignment in the former executive assignment system, following open competitive examination, or by statute, Executive order, or the Civil Service rules, without open competitive examination. An individual with competitive status may be, without open competitive examination, reinstated, transferred, promoted, reassigned, or demoted, subject to conditions prescribed by the Civil Service rules and regulations.

5 C.F.R. § 212.301 (2019).

[10] The defendant agrees that "[i]f Mr. Williams had submitted the SF-50 referencing his removal, that would indicate that he was not a current Federal employee, and his resume would not have been further reviewed."

required by the application, and his rejection for that job was because the West Palm Beach Veterans Affairs Medical Center considered his application incomplete. The record is not clear as to why Mr. Williams did not submit a copy of his SF-50 to the West Palm Beach Veterans Affairs Medical Center with his job application. Perhaps, although not established in the record, plaintiff considered that a revised SF-50 had not yet been processed and included in his file. Plaintiff's application to the West Palm Beach Veterans Affairs Medical Center was submitted only two days after the Settlement Agreement was executed. A delay of two days for the agency to change the SF-50 is drastically different from a lengthy delay of approximately five months (which is the length of time it actually took the agency to process a revised SF-50) and, arguably, would not be considered a breach of the terms of the Settlement Agreement.

In July of 2014, Mr. Williams applied for a police officer position at the Lake Nona Veterans Affairs Medical Center in Orlando, Florida. Mr. Williams submitted with his application to the Lake Nona Veterans Affairs Medical Center the SF-50 which still reflected his removal noted on the SF-50. Mr. Williams was interviewed for the police officer position with the Lake Nona Veterans Affairs Medical Center. During the interview, Mr. Williams was told by the Deputy Chief of Police for Orlando "that he (Deputy Chief) was unable to locate Mr. Williams through an Agency-wide Microsoft Outlook search or locate his (Mr. Williams') address." (capitalization in original). Mr. Williams ultimately was not selected for the Lake Nona Veterans Affairs Medical Center job. Mr. Williams' application for the Lake Nona Veterans Affairs Medical Center job included the SF-50 that indicated the "Nature of Action" as a "REMOVAL," and under "Remarks," stated "REASON FOR SUSPENSION : INAPPROPRIATE CONDUCT AND CONDUCT UNBECOMING A FEDERAL EMPLOYOEE [sic]." (capitalization in original). Furthermore, Mr. Williams' SF-50 referenced the Settlement Agreement, and included a case number before the MSPB. Under remarks, the SF-50 also stated: "MSPB SETTLEMENT AGREEMENT DOCKET NO. CH-0752-13-2514-I-1. DTD 6/3/2014." (capitalization in original). Defendant's failure to revise Mr. Williams' SF-50 was a material breach of the Settlement Agreement. Plaintiff's main purpose for entering into the Settlement Agreement was to remove any references to the removal and the reasons behind it. Plaintiff, quite reasonably, believed his ability to receive another police officer position at a VA facility would be harmed if the original SF-50 remained in his file. The failure to remove the original SF-50 in violation of the Settlement Agreement was a material breach and impacted Mr. Williams' ability to satisfactorily apply for, and obtain, an employment opportunity.

Plaintiff also alleges that a human resources representative at Lake Nona Veterans Affairs Medical Center questioned plaintiff's status as a federal employee. Defendant asserts that Mr. Michael Brown, the human resources representative working at Lake Nona Veterans Affairs Medical Center in Orlando, does not recall having a telephone conversation with Mr. Williams. Defendant provided an affidavit from Mr. Brown with its motion for summary judgment. Mr. Brown's affidavit indicated that he had "no recollection of speaking with Mr. Williams during the pendency of his application in 2014" and that Mr. Brown "did not speak with anyone at the Dayton VAMC regarding Mr. Williams or Mr. Williams's application to the Orlando VA police service." Defendant contends that "Mr.

Williams has not produced evidence to the contrary, despite having two periods of discovery in which to probe Mr. Brown's memory."[11]

Despite the government's contention that only human resources personnel at the Lake Nona Veterans Affairs Medical Center viewed the SF-50, the very fact that Mr. Williams' uncorrected SF-50, which included the negative information about plaintiff, was in Mr. Williams' file when he applied for the position at Lake Nona Veterans Affairs Medical Center meant that plaintiff was at a disadvantage. The SF-50 included in plaintiff's application to the Lake Nona Veterans Affairs Medical Center referenced "REMOVAL," and under "Remarks," the "REASON FOR SUSPENSION : INAPPROPRIATE CONDUCT AND CONDUCT UNBECOMING A FEDERAL EMPLOYEE [sic]." (capitalization in original).

It is apparent that Mr. Williams entered into the Settlement Agreement to make it possible for plaintiff to obtain a different position without the references to suspension for inappropriate conduct and conduct unbecoming a federal employee. This is evident from the very first three sections of the Settlement Agreement which state:

> 1. Appellant's August 9, 2013, removal for "Inappropriate Conduct Toward Staff" and "Conduct Unbecoming a Federal Employee" shall be rescinded.

> 2. The  Agency shall process a Standard Form 50 and a Standard Form 52; (1) rescinding Appellant's [Mr. Williams'] removal and (2) restoring him to the position of Police Officer, Police Service, Dayton Veterans Affairs Medical Center retroactive to August 9, 2013.

> 3. The Parties agree that any, and all, documents of, and concerning, the Appellant's Notice of Proposed Removal and Removal Decision shall be removed from all files electronic, or otherwise, under the control of Dayton Veterans Affairs Medical Center.

Plaintiff could not realistically expect to obtain another VA or other similar position with such a reference in his file, nor could he reasonably expect to easily receive another job with a notation that he had entered into the Settlement Agreement with the DVAMC in his file. The purposes of the Settlement Agreement were frustrated by the agency's failure to timely change the negative references in the SF-50. The failure to change the reference until November 2014, and well after plaintiff applied to the Lake Nona Veterans Affairs Medical Center was a material breach of the Settlement Agreement. Further, the agency did not comply with the terms of the Settlement Agreement and frustrated the intention of the Settlement Agreement which specifically was intended to allow Mr. Williams to apply for other positions as if he were only on a leave without pay status, without further

---

[11] Moreover, although it not clear from the record whether or not the human resources representative at Lake Nona Veterans Affairs Medical Center questioned plaintiff's status as a federal employee, it appears from the record that plaintiff's personnel file may have listed plaintiff as inactive until November 2014.

explanation of the reason for or to the Settlement Agreement he had entered into with the agency.

In addition to the West Palm Beach Veterans Affairs Medical Center and the Lake Nona Veterans Affairs Medical Center, Mr. Williams applied for a position at the Bay Pines Veterans Affairs Medical Center. As with the applications to the West Palm Beach Veterans Affairs Medical Center and the Lake Nona Veterans Affairs Medical Center, plaintiff was not selected for the position, learning he did not receive the position on December 4, 2014. Like the Lake Nona Veterans Affairs Medical Center application, Mr. Williams' Bay Pines Veterans Affairs Medical Center application apparently included the SF-50 which referenced the Settlement Agreement, and included a case number before the MSPB. Under remarks, the SF-50 stated: "MSPB SETTLEMENT AGREEMENT DOCKET NO. CH-0752-13-2514-l-1. DTD 6/3/2014," (capitalization in original) and the SF-50 included which indicted the "Nature of Action" as a "REMOVAL," and under "Remarks," the "REASONS FOR SUSPENSION: INAPPRORIATE CONDUCT AND CONDUCT UNBECOMING A FEDERAL EMPLOYEE." (capitalization in original). As with the Lake Nona Veterans Affairs Medical Center application, defendant's failure to revise Mr. Williams' SF-50 was a material breach of the Settlement Agreement for plaintiff's application to Bay Pines Veterans Affairs Medical Center as the failure to remove the original SF-50 materially damaged plaintiff's ability to secure new employment and frustrated the purpose of the Settlement Agreement.

The court notes that, although in addition to the issue of the uncorrected SF-50 Mr. Williams submitted to the Bay Pines Veterans Affairs Medical Center, plaintiff claims that he did not receive a neutral reference for his application to that Bay Pines Veterans Affairs Medical Center, and that this also was a material breach of the Settlement Agreement. The Settlement Agreement provided that "[t]he Agency agrees to provide a neutral reference to all prospective employers." As indicated above, Mr. Williams' interviewed at the Bay Pines Veterans Affairs Medical Center on November 11, 2014, and had a second, telephonic, interview with the Chief of Police at Bay Pines Veterans Affairs Medical Center on November 17, 2014. Plaintiff alleges that during the November 17, 2014 phone interview he was given "several indications that he was very likely to be offered the position" with Bay Pines Veterans Affairs Medical Center.

After Mr. Williams' interview on November 17, 2014, Captain Kyer, at the DVAMC, was called for a reference check by the Chief of Police at Bay Pines Veterans Affairs Medical Center. In Captain Kyer's declaration included with defendant's motion for summary judgment, Captain Kyer indicated: "I told the chief that I was Mr. Williams's supervisor. I told the chief that I would stand by the "outstanding" reviews I have given Mr. Williams in his performance evaluations at Dayton." Captain Kyer's declaration further stated: "I was aware of his settlement agreement in 2014 that placed Christopher Williams on leave without pay and allowed him to apply to other Federal positions. I was aware of the requirement in the agreement to provide a neutral reference should anyone call for a reference check on Mr. Williams." In response to the declaration of Captain Kyer that defendant included in the motion for summary judgement, plaintiff contends that:

The declaration of Capt. Kyer, DVAMC Police Captain, is exceptional in several ways. First of all, Capt. Kyer does not claim that he is not to be able to remember anything. To the contrary, Capt. Kyer remembers that he was aware of the terms of the Settlement Agreement, that Mr. William's [sic] was on a LWOP status, and that Capt. Kyers [sic] was required to provide a neutral reference for Mr. Williams. Most importantly, Capt. Kyer remembers speaking to the Chief of Police at the Bay Pines VA facility, but instead a [sic] neutral reference, Capt. Kyer told the Police Chief that he "would stand by the "outstanding" [sic] reviews he had given Mr. Williams in his performance evaluations at Dayton." Clearly, for Capt. Kyer to have to tell the Police Chief that he would "stand by" his reviews implies that someone had made negative comments to the Police Chief about Mr. Williams' performance. Furthermore, no explanation is given as to why Capt. Kyer would know that he was required to provide Mr. Williams with a neutral reference, but no one in the DVAMC HR department knew what the DVAMC was required to do with respect to issuing the appropriate SF-50 and SF-52 forms reinstating Mr. Williams and placing him on a LWOP status, and expunging information about Mr. Williams' removal from his eOPF.

Plaintiff's application to the Bay Pines Veterans Affairs Medical Center was rejected on December 4, 2014. Plaintiff cannot point to any specific action or evidence, other than his belief that given a neutral reference he would have received the position at the Bay Pines Veterans Affairs Medical Center and plaintiff has not demonstrated that DVAMC's reference regarding plaintiff's Bay Pines Veterans Affairs Medical Center application was the result of a negative comment. The court notes, however, that the agency did not remove from the SF-50 the references to plaintiff's removal earlier than November 2014, and therefore, the uncorrected SF-50 was included in plaintiff's application for the Bay Pines Veterans Affairs Medical Center and appears to have remained in plaintiff's file while his application was pending, which as determined above, was a material breach of the Settlement Agreement.

Plaintiff cites to Conant v. Office of Personnel Management, 255 F.3d 1371 and Lutz v. United States Postal Service, 485 F.3d 1377, both cases in which subsequent to entering into individual settlement agreements with federal agencies, the federal agencies materially breached the settlement agreements, to support his position that in the above captioned case, the DVAMC materially breached the executed Settlement Agreement. Defendant also cites to Conant and Lutz, but for the opposite position and argues that "Mr. Williams's SF-50 remaining in his file is far removed from what the Federal Circuit has held constitutes a material breach of a settlement agreement." In its reply brief, defendant emphasizes that "under prevailing Federal Circuit case law, a material breach would only occur if the SF-50 referencing the removal was provided to one of the hiring agencies, Conant v. Office of Pers. Mgmt., 255 F.2d 1371, 1377 (Fed. Cir. 2001); Lutz v. U.S. Postal Serv., 485 F.3d 1377, 1381 (Fed. Cir. 2007) which did not happen," apparently arguing that the defendant would have had to be the one supplying the original version of the SF-50 for a material breach to have occurred.

In <u>Conant</u>, the plaintiff worked for the Internal Revenue Service (IRS), but the IRS sought her removal based on two incidents. The Federal Circuit in <u>Conant</u> indicated:

Ms. Conant and the IRS reached a settlement agreement in November 1996. The relevant provisions of the agreement for the purposes of the present appeal are:

1.  The Agency will rescind the SF–50 reflecting that the Grievant had been removed, and will issue a new SF–50 reflecting that the Grievant resigned for personal reasons.

. . . . .

3. The Grievant agrees that she will not seek or accept employment in the future with any office of any Department of the Treasury agency or bureau. She further agrees that she will never apply to become an enrolled agent.

. . . . .

4. The Grievant will withdraw with prejudice her grievance concerning the removal, and the union will withdraw with prejudice its invocation of arbitration concerning the removal of the Grievant.

. . . . .

11. The Agency will utilize its best efforts to effectuate the Grievant's application for disability retirement and life insurance.

<u>Conant v. Office of Personnel Mgmt.</u>, 255 F.3d at 1373-74. The plaintiff in <u>Conant</u> had filed a claim for disability from the Office of Personnel Management, but it was denied. The IRS, in fact,

submitted the "Supervisor's Statement" forms required from an applicant's agency in connection with disability retirement. However, Ms. Conant was not aware that the IRS's documentation included: (1) a declaration by her supervisor on the Supervisor's Statement asserting that Ms. Conant suffered from "no documented medical condition"; (2) an "Attachment" which alleged that Ms. Conant "falsified time sheets" and "violated the rules of conduct" of her agency, and referenced the June 20, 1995 stop at the neurologist's office and her breaks outside during August 1995; and (3) the original Removal SF 50 removing Ms. Conant for "failure to observe official duty hours."

<u>Conant v. Office of Personnel Mgmt.</u>, 255 F.3d at 1374. Subsequently, the Office of Personnel Management denied Ms. Conant's disability application, concluding that "Ms. Conant had failed to establish: (a) that she had a disabling medical condition; that she was disabled for useful and efficient service; or (b) that a nexus existed between her putative medical condition and her 'falsification of time and work reports.'" <u>Id.</u> The Federal

Circuit determined on appeal that "[t]he IRS has clearly breached its obligations under the agreement." Id. at 1376. The Federal Circuit determined:

> In paragraph 1, the IRS stipulated that it would "rescind" the original Removal SF–50 and issue a new SF–50 stating that Ms. Conant resigned for personal reasons. By agreeing to "rescind" the Removal SF–50, the IRS promised in effect to destroy it, erasing "removal" and all reasons for such a removal from Ms. Conant's professional record with the agency. By agreeing to issue a new SF–50 in its place, the IRS promised that the only legal document recording the end of Ms. Conant's employment with the agency would henceforth be the SF–50 stating she resigned for personal reasons. Accordingly, by submitting the original Removal SF–50 with Ms. Conant's disability application, the IRS breached the agreement and prejudiced the disability proceedings.

Id. The Federal Circuit also determined that:

> The IRS breached the settlement agreement by submitting documents it had agreed to rescind, and by using its "best efforts" to undermine rather than "effectuate" Ms. Conant's disability application when it reiterated those allegations of misconduct resolved by the agreement. This breach of the settlement agreement was not immaterial because, on the basis of the IRS's allegations, both OPM and the Board expected Ms. Conant to prove a nexus between her disability and the alleged misconduct.

Id.

As discussed above, like the plaintiff in Conant, the major purpose of the Settlement Agreement Mr. Williams entered into after an averse agency action was to let the plaintiff pursue other employment opportunities, even with the same agency, albeit not at the same facility. The purpose of Ms. Conant's settlement agreement and Mr. Williams' Settlement Agreement, however, both were frustrated by their respective agencies, in the case of Ms. Conant by the IRS' statements about her health and the reasons for her removal in the file, and in the case of Mr. Williams, by the original SF-50 remaining in his file with the reason for his removal and not providing him with a corrected version he could submit with his applications. Both Ms. Conant and Mr. Williams entered into their respective settlement agreements to avoid precisely what happened to them, their future applications containing the very information they had negotiated in the respective settlement agreements would not be included in their files for future applications. Specifically, in Mr. Williams' case, the DVAMC included a reference to the Settlement Agreement on his SF-50 and included the underlying case number, further drawing attention to the negative information included in his personnel file, in addition to retention in the SF-50 reflecting his removal and including the notation, "REASON FOR SUSPENSION : INAPPROPRIATE CONDUCT AND CONDUCT UNBECOMING A FEDERAL EMPLOYOEE [sic]." (capitalization in original). The Conant case likewise involved negative information submitted by the agency and a written decision denying the requested actions. Mr. Williams' employment applications for future employment

opportunities were not successful. Each of plaintiff's applications discussed above continued to contain negative information. Both Ms. Conant and Mr. Williams faced obstacles despite the settlement agreements they had entered into, and, in fact, both were denied success when they submitted their applications.

In Lutz v. United States Postal Service, a plaintiff was demoted from the position of postmaster to the position of mailhandler following "the Postal District Manager's review of a proposal to fire Mr. Lutz based upon charges of failure to perform his assigned duties and misconduct." Lutz v. United States Postal Serv., 485 F.3d at 1378. Mr. Lutz appealed the Postal Service's action, and the agency and Mr. Lutz subsequently entered into a settlement agreement which provided that: "Within 30 days of the date this Settlement Agreement is fully executed, Appellant agrees to take all necessary steps to apply for disability retirement with [the Office of Personnel Management]. The Agency agrees to take all necessary steps to cooperate and facilitate the acceptance of Appellant's application and agrees not to place negative statements in the supervisor statement." Id. at 1379 (brackets in original). The Federal Circuit noted that:

> In accordance with the settlement agreement, Mr. Lutz applied for disability retirement with the Office of Personnel Management ("OPM"). The Postmaster of the Ann Arbor post office submitted a supervisor's statement to OPM in connection with the application. The supervisor's statement included the following statements regarding Mr. Lutz:

> Refused to work in his position as a mail handler. Brought in documentation from Dr. was sent to Fitness for Duty [ ("FFD") ] and was found fit for duty. Refused to work still.
> . . . .
> Sent to FFD [Fitness for Duty] and was found to have no issues. He however refused to work and claimed an accident.
> . . . .
> He supposedly hurt his back when working on carrier routed flats. This then resulted in lifting restriction which we would have kept. However he did not return to work due to other issues with MSPB settlements.

Id. (alterations in original). OPM denied Mr. Lutz's disability retirement application, and in response, "Mr. Lutz petitioned for enforcement of the settlement agreement, claiming that the agency was in breach of the agreement by including negative remarks in the supervisor's statement submitted to OPM in support of the application for disability retirement." Id. (footnote omitted). After an administrative law judge found the agency had breached the settlement agreement, the government filed a brief with the Merit Systems Protection Board, which "concluded that OPM's denial of Mr. Lutz's application was based on his failure to supply OPM with any relevant and credible medical records establishing his disability, and that OPM would have denied the application regardless of any allegedly negative remarks contained in the supervisor's statement." Id. On appeal, the United States Court of Appeals for the Federal Circuit determined that the agency's actions were indeed a breach of the settlement agreement, as follows:

> The agency explicitly agreed "not to place negative statements in the supervisor statement." However, the statements the agency included in the supervisor's statement are indisputably negative in tone, asserting that Mr. Lutz "refused" to work his position. Furthermore, the statements are rife with innuendo, stating that Mr. Lutz "claimed" an accident and "supposedly" hurt his back. In short, they imply that Mr. Lutz has no medical issues and was less than truthful in his disability claims. Under the terms of the settlement agreement, the agency was foreclosed from employing such a negative tone in the supervisor's statement and from including statements that insinuated that Mr. Lutz faked an injury in order to refuse to work. The agency agreed to "take all necessary steps to cooperate and facilitate the acceptance of Appellant's application." The negative statements included in the supervisor's statement did not "facilitate the acceptance" of Mr. Lutz's application and were more likely to impede and prejudice the application than facilitate its acceptance. In short, the agency breached its obligation under the settlement agreement.

Id. at 1381 (internal references omitted). The Federal Circuit considered if the breaches of the settlement agreement were material to the settlement agreement, and determined that the breaches, in fact, were material.  The Federal Circuit noted that:

> The essential purpose of ¶ 3c in the settlement agreement here was to accommodate Mr. Lutz's application for disability retirement. As in *Conant,* the negative statements contained in the supervisor's statements prejudiced the disability proceedings. OPM explicitly relied on the supervisor's statements as one of two factors in denying the request for disability retirement, the other factor being a lack of medical evidence to establish a disabling medical condition.

Lutz v. United States Postal Serv., 485 F.3d at 1381-82. The Federal Circuit concluded that "[w]hile it is impossible to know precisely to what extent these statements colored the analysis of OPM, it is clear that the statements did discourage OPM's acceptance of Mr. Lutz's disability retirement application. Therefore, the breach was not immaterial, and the Board erred in dismissing Mr. Lutz's petition for enforcement." Id. at 1382.

In the case before this court brought by Mr. Williams, the Settlement Agreement was breached. This court cannot determine with certainty whether Mr. Williams' failure to obtain a new position was clearly the result of the failure of the DVAMC to take out the negative reference to his SF-50 for each of the applications he filed, but the court cannot discount the very real possibility that there was a negative impact.  As in Lutz, the purpose of the Settlement Agreement was frustrated by the subsequent actions taken by the agency. The Settlement Agreement was not just about payment of money damages to Mr. Williams. For plaintiff, a critical part of the Settlement Agreement was executed precisely to permit Mr. Williams to pursue other employment opportunities, even at the same agency. This is made plain by the detailed instructions to replace the SF-50 and

allow Mr. Williams to pursue other employment opportunities, including at other VAMCs, to provide him a neutral reference, and to maintain plaintiff's status as an employee on leave without pay. The approximately five month delay in placing the corrected SF-50 in Mr. Williams' file, and making a corrected SF-50 available to plaintiff by also taking out references to the Settlement Agreement was material non-compliance with the terms of the settlement. See Lutz v. U.S Postal Serv., 485 F.3d at 1381.

As noted above,"[t]o recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach. San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959. Regarding damages, "[t]o satisfy this fourth element, the plaintiff also must show that: '(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty.'" Shell Oil v. United States, 130 Fed. Cl. at 34 (quoting Indiana Michigan Power Co. v. United States, 422 F.3d at 1373). In plaintiff's complaint, plaintiff "requests an award of for [sic] damages in an amount not yet fully ascertained, but estimated to be $1,000,000, to include back pay, front pay, pre-judgment interest, interest, costs herein expended, and such other relief as the Court finds just." Plaintiff, however, provides no explanation for how he reached the large figure of $1,000,000, especially in light of plaintiff's salary at his previous position at the DVAMC. In plaintiff's motion for summary judgment as to liability, plaintiff "requests this Court grant summary judgment as to liability, and schedule a hearing for damages." In plaintiff's reply to the motion for partial summary judgment as to liability, although some discovery has already occurred plaintiff states:

> Mr. Williams agrees that there are genuine issues of material fact with respect to whether the DVAMC's breach of the Settlement Agreement is the reason for the rejection of his job applications at the West Palm Beach, Orlando, and the Bay Pines Veterans Affairs Medical Centers, and the damages that he has incurred as a result of the DVAMC's breach. For this very reason, the Court must deny the Defendant's MSJ [motion for summary judgment], as there are genuine issues of material fact as to whether the damages Mr. Williams has incurred were proximately caused by the DVAMC's breach of the Settlement Agreement.

(capitalization in original). At this time, the court only grants plaintiff's motion for partial summary judgment as to liability. The court does not reach the issue of damages in this Opinion. The court notes, however, that all the forms of relief plaintiff seeks in its complaint, damages might not be available to plaintiff.[12] The court also notes the

---

[12] The court notes it is unclear if, in seeking back pay, plaintiff could rely on the Back Pay Act. The Back Pay Act alone is not a money-mandating statute. As found by a Judge of the United States Court of Federal Claims:

challenge that plaintiff could face in proving damages, given that the Settlement Agreement does not contemplate any specific amount of damages for a breach of the Settlement Agreement.

## CONCLUSION

As determined above, plaintiff has demonstrated that defendant breached the Settlement Agreement by failing to take steps to correct and replace plaintiff's SF-50 and that the breach was material to the terms of the Settlement Agreement. Therefore, plaintiff's partial motion for summary judgment for liability is **GRANTED**. Defendant's motion for summary judgment is **DENIED**. Future proceedings regarding the amount of damages will be set by a separate Order.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

The Back Pay Act, 5 U.S.C. § 5596, "does not, itself, provide a statutory basis for invoking this Court's jurisdiction." Sacco v. United States, 63 Fed. Cl. 424, 428 (2004) (citing United States v. Connolly, 716 F.2d 882, 887 (Fed. Cir. 1983)). Rather, "[t]he Back Pay Act is merely derivative in application; it is not itself a jurisdictional statute." [United States v.] Connolly, 716 F.2d at 887. In order for this Court to have jurisdiction over plaintiffs' claims, "some provision of law other than the Back Pay Act must first mandate . . . money damages to an employee suffering an unjustified or unwarranted personnel action." Sacco [v. United States], 63 Fed. Cl. at 428 (citing Walker v. United States, 11 Cl. Ct. 77, 80 (1986)).

Jaynes v. United States, 75 Fed. Cl. 218, 226 (2007). According to the United States Court of Appeals for the Federal Circuit, the Back Pay Act can be considered money-mandating, only if it is based on a violation of a statute or regulation covered by the Tucker Act. See Worthington v. United States, 168 F.3d 24, 26 (Fed. Cir. 1999) ("To fall within the Tucker Act's jurisdictional grant, a claim must invoke a statute that mandates the payment of money damages. The Back Pay Act is such a 'money-mandating' statute when based on violations of statutes or regulations covered by the Tucker Act."). Based on the record before the court to date, plaintiff's claims appear to stem from the breach of the Settlement Agreement. The court also is unclear as to the basis of plaintiff's claim for "front pay" in the complaint, since the Settlement Agreement specifically placed plaintiff on leave without pay status, as well as providing for $45,000.00, of which $19,545.97 was paid to Mr. Williams, and the balance of $25,454.03 was paid to his attorneys.